**MAINE SAVINGS BANK**

v.

**Dalton L. BRIDGES, et al.**

Supreme Judicial Court of Maine.

Argued May 8, 1981.

Decided July 7, 1981.

**634**

Verrill & Dana, Christopher S. Neagle, Portland, for plaintiff.

James F. Cloutier (orally), Cloutier & Woodman, Portland, for Dalton Bridges.

Martin J. Foley (orally), Law Offices of Ralph A. Dyer, P.A., Portland, for Rodney & Dawn Marie Bridges.

Drummond, Woodsum, Plimpton & MacMahon, P.A., John A. Anderson, III, Portland, for Harris Oil Co.

Before WERNICK, GODFREY, NICHOLS and ROBERTS, JJ.

WERNICK, Justice.

This appeal by defendants Dalton L. Bridges and Alexander MacNichol from a summary judgment adverse to them entered in the Superior Court (Cumberland County) raises the question, not yet squarely decided by this Court, of what interest, if any, is retained or taken by one of two joint tenants of real property who, as established by a judgment of conviction entered in a criminal prosecution, has "intentionally or knowingly" killed the other joint tenant, in violation of 17–A M.R.S.A. § 201(1)(A).

The civil action in which the summary judgment now under attack was entered was instituted by plaintiff Maine Savings Bank on September 20, 1979, to foreclose two mortgages on real property situated in Westbrook and owned in joint tenancy by defendant Dalton L. Bridges and his wife Dianne. Dalton Bridges defaulted on these mortgages after he had "intentionally or knowingly" killed Dianne in December, 1978. Alexander MacNichol was named a defendant in the foreclosure action because, after Dianne had been killed, he had taken a mortgage from Dalton on the Westbrook property at issue. Plaintiff bank named Rodney Bridges and Dawn Marie Bridges as parties defendant to the action by reason of their status as the children and heirs of Dianne.

By cross claim against the defendants Dalton L. Bridges and Alexander MacNichol, the defendants Rodney Bridges and Dawn Marie Bridges, alleging themselves to be the heirs of Dianne Bridges, sought a declaration adjudicating, as one of two claimed alternatives, that by reason of his having "intentionally or knowingly" killed Dianne Bridges and his having been duly convicted of said murder, Dalton "forfeited or otherwise lost all right, title and interest in the premises [at issue] . . . upon the death of Dianne Bridges"; and, therefore, MacNichol, as having become after the death of Dianne a purported mortgagee from Dalton of the premises, "has no right, title or interest in the premises . . . ."

The cross claim also asked this Court to declare that if it

"issues a Judgment of Foreclosure and Sale of the premises . . . in favor of the Maine Savings Bank, the Defendants Cross-Claimants Rodney Bridges and Dawn Marie Bridges have a priority in-

terest over the whole world in any proceeds in excess of the amount of the obligation owed to Maine Savings Bank."

In the same vein, by a counterclaim against plaintiff bank defendants Rodney and Dawn Marie Bridges asked for a declaration as to "who owns title to the premises" sought to be foreclosed, and that

> "all proceeds of any sale of the premises ... are the sole property of the Defendants Rodney Bridges and Dawn Marie Bridges, subject only to any valid liens determined ... to exist on said premises."

On February 13, 1980, judgment was entered in the Superior Court in favor of plaintiff bank. The judgment adjudicated the amount to which plaintiff bank was entitled under its mortgage and ordered a foreclosure and sale of the Westbrook premises, as well as that any surplus proceeds of the sale be paid into court pending resolution of the dispute among the defendants.[1]

On June 23, 1981 the Superior Court finally adjudicated the dispute over entitlement to the surplus, deciding in favor of Rodney and Dawn Marie "against Dalton L. Bridges, Alexander MacNichol and Harris Oil Company."[2] The ground of the adjudication was that Dalton Bridges

> "upon the murder of his wife and co-tenant, ... forfeited any and all interest, right and title he had to the premises",

and that, therefore,

> "on December 27, 1978, all right, title and interest ... [therein] passed to the heirs of Dianne Bridges, namely, Rodney Bridges and Dawn Marie Bridges, subject to the right and interest of the Maine Savings Bank therein."[3]

We earlier stated that we have not yet addressed or decided, the precise issue precipitated by this summary judgment. We have, however, made one decision that has analogous bearing. We have held that sound public policy requires precluding the primary beneficiary of an insurance policy on the life of her husband, whom she had killed, from taking the proceeds of the policy. *Metropolitan Life Insurance Company v. Wenckus*, Me., 244 A.2d 424, 425 (1968). Moreover, as to another analogous situation, a single justice of the Supreme Judicial Court, adverting to "the policy of the common law that no one should be allowed to profit by his own wrong", decided that an heir who murdered his ancestor took legal title to the ancestor's property but held it as constructive trustee, with the duty to convey it to the heirs or next of kin of the ancestor exclusive of himself. *Dutill v. Dana*, 148 Me. 541, 547–48, 113 A.2d 499, 502 (1952).

The legal status of a joint tenant of realty, however, is plainly distinguishable from that of an heir or of a beneficiary of a life insurance policy. A joint tenant of land has a present legal estate in the realty, in consequence of which such tenant has present rights to benefits regarding the possession, use and enjoyment of the land. In addition, a joint tenant of realty has a present right to transform into a different present and vested interest the possibility, the gamble—uniquely characteristic of a joint tenancy—that, depending on whether or not he is the survivor of the joint tenants, he will end up owning all, or none, of the property. Such right can be exercised (1) by a unilateral act of conveyance to

---

1. Sale of the property was consummated on April 27, 1981, and on April 30, 1981 surplus proceeds of $3,356.98 were turned over to the Clerk of the Superior Court.

2. After the judgment of foreclosure and sale had been entered, Harris Oil Company had been permitted to intervene, on March 21, 1980, as if named an original party defendant, to assert enforcement of a judgment lien it had acquired, as of January 31, 1980, against the real property of Dalton L. Bridges.

3. At oral argument doubts arose as to the finality of an earlier summary judgment entered September 9, 1980 in favor of Rodney and Dawn Marie Bridges. We remanded to the Superior Court to allow for entry of a final judgment and for the filing of a supplemental record on appeal, to enable us to decide the case without need for new briefing or oral argument.

sever the joint tenancy and to create an immediate, non-contingent ownership of an undivided one-half or (2) through partition proceedings, to have awarded a specifically defined one-half part of the land in kind, or one-half of the proceeds derived from a sale of the land.

Our view, then, is that these *presently* existing interests and rights of a joint tenant cannot be ignored, or lightly regarded, in formulating a sound public policy to deal with the situation of a joint tenant of realty who has been convicted of having "intentionally or knowingly" killed the other joint tenant.

Hence, we disagree with the decisions in some jurisdictions that have gone so far as to preclude the "murderer" joint tenant from retaining any legal or beneficial interest whatever relative to the realty held in joint tenancy prior to the killing of the other joint tenant. *See, e.g., Bierbrauer v. Moran*, 244 App.Div. 87, 279 N.Y.S. 176 (1935); *Van Alstyne v. Tuffy*, 103 Misc. 455, 169 N.Y.S. 173 (1918); *In re King's Estate*, 261 Wis. 266, 52 N.W.2d 885 (1952). We think this too drastic an approach. It is extra punitive since it effects a forfeiture of the present rights. It goes beyond the requirements of a public policy that, soundly, would prevent the "murderer" from acquiring *new* benefits, thereby to achieve the twin objectives of denying the wrongdoer profit from his wrong and avoiding creation of potential incentives to murder.

On the other hand, precisely because these objectives of a sound public policy would be defeated, we cannot follow those decisions of other courts that, looking only to the reality that the victim predeceased the murderer while ignoring the other reali-

ty of the criminal conduct involved, hold the "murderer" entitled to the full legal and equitable interest in the joint tenancy property. *See, e.g., Smith v. Greenburg*, 121 Colo. 417, 218 P.2d 514 (1950); *Beddingfield v. Estill & Newman*, 118 Tenn. 39, 100 S.W. 108 (1907); *Shuman v. Schick*, 95 Ohio App. 413, 53 Ohio Ops. 441, 120 N.E.2d 330 (1953).

■ Rather, we adopt a position that does not further "punish" the "murderer", by requiring a forfeiture of his undoubted property rights as a joint tenant of realty, but that does deny him ill-gotten gain. We decide that Dalton L. Bridges' "intentional or knowing" killing of his wife Dianne, as having been established by the judgment of conviction entered against him in a criminal prosecution, effected a severance of their joint tenancy in the Westbrook real estate. In consequence, on the death of his wife, Dalton became the owner, as tenant in common, of an undivided one-half of the Westbrook property.

This conclusion is in accord with Section 2–803(b) [4] of Maine's New Probate Code, 18–A M.R.S.A. § 1–101 *et seq.*, effective January 1, 1981. True, the Code does not control the decision of this case, since it was not yet in effect when Dalton Bridges "intentionally or knowingly" killed his wife Dianne. We are strongly guided, however, by the public policy it embodies, both because we look to the legislature as the constitutionally designated primary expositor of public policy and because we think that the public policy reflected in Section 2–803(b) is sound.[5]

Further guided by the public policy of the Code, as embodied in Section 2–803(a) to prevent unjust enrichment,[6] we decide that

---

**4.** Section 2–803 states:

"Any joint tenant who feloniously and intentionally kills another joint tenant thereby effects a severance of the interest of the decedent so that the share of the decedent passes as his property and the killer has no rights by survivorship. This provision applies to joint tenancies in real and personal property, joint and multiple-party accounts in banks, savings and loan associations, credit unions and other institutions, and any other form of coownership with survivorship incidents."

**5.** *See also, e.g., Johansen v. Pelton*, 8 Cal. App.3d 625, 87 Cal.Rptr. 784 (1970); *In re Estate of Nunnelley*, 343 So.2d 657 (Fla.App. 1977); *Bradley v. Fox*, 7 Ill.2d 106, 129 N.E.2d 699 (1955); *In re Estate of Shields*, 1 Kan. App.2d 688, 574 P.2d 229 (1977); *Duncan v. Vassaur*, Okl., 550 P.2d 929 (1976).

**6.** Section 2–803(a) provides:

"A surviving spouse, heir or devisee who feloniously and intentionally kills the decedent is not entitled to any benefits under the

Dalton Bridges' "intentional or knowing" killing of his wife Dianne precludes him from taking anything, by reason of his wife Dianne's death, as to the one-half interest, undivided, in the Westbrook realty yielded by the severance of the joint tenancy and passing through Dianne's estate. We think it appropriate, in agreement with the policy reflected in the Probate Code, to act in this direct manner and dispense with the extra intermediate step of imposing on Dalton Bridges a constructive trust, with the duty to convey to Dianne's heirs (exclusive of Dalton as widower).[7]

The entry shall be:

Appeal sustained; the summary judgment of the Superior Court is set aside; case remanded to the Superior Court for entry of a new summary judgment in conformity to the opinion herein, and for further appropriate proceedings.

All concurring.

will or under this Article, and the estate of decedent passes as if the killer had predeceased the decedent. Property appointed by the will of the decedent to or for the benefit of the killer passes as if the killer had predeceased the decedent."

7. The single justice who made the decision in *Dutill v. Dana, supra,* acknowledged, 148 Me. at 546, 113 A.2d 499, that the two approaches involve "but little difference in result", that the direct technique "simply shortcuts the distribution."