ESTATE OF KING: Lore, Administrator, Appellant, vs. HABERMEYER, Respondent.*

*February 6—April 8, 1952.*

---

* Motion for rehearing denied, with $25 costs, on June 3, 1952.

For the appellant there was a brief by *I. A. Dinerstein,* attorney, and *Wm. B. Rubin* of counsel, and oral argument by *Mr. Rubin* and *Mr. Irving A. Lore,* all of Milwaukee.

For the respondent there was a brief by *Affeldt &Lichtsinn* and *C. R. Reilly,* guardian *ad litem,* attorneys, and *Eldred Dede* of counsel, all of Milwaukee, and oral argument by *Mr. George A. Affeldt* and *Mr. Reilly.*

BROWN, J. Sec. 253.03 (2), Stats., puts jurisdiction in the county court,—concurrent with the circuit court,—to determine title to or interest in real and personal property in so far as that is necessary for the complete administration of an estate.

Jurisdiction of the subject matter is conceded because of the statute. However, appellant submits that concurrent jurisdiction requires the county court to concur in the practice by which controversies over titles to realty are presented to the circuit court. Hence he argues,—though to do him justice, without much fervor,—that the court's jurisdiction should have been invoked by a summons and complaint served by the claimant on the administrator of Mr. King's estate.

When the personal representative of the deceased holds and asserts title to personalty which is also claimed by another person it has been the practice for that other to apply to the county court for the surrender of his property, whereupon the issue of ownership has been tried and determined. It was so done in *Estate of Nols* (1947), 251 Wis. 90, 28 N. W. (2d) 360, and in *Estate of Abddulah* (1934), 214 Wis. 336, 252 N. W. 158, both approved by this court, and in other cases. When the legislature, in 1949, by sec. 253.03 (2), Stats., added real estate to the properties whose title might be adjudicated in county courts if that were necessary to the settlement of an estate, we find no reason to believe that it had any intention to modify the procedure which was already operating satisfactorily in those courts in respect to the ownership of personalty. The words of sec. 253.03 (2) which give the county court concurrent jurisdiction to try real estate titles ". . . to the same extent and with like effect as such matters and controversies may be heard, tried, and determined in courts of general jurisdiction" refer to the scope and effect of the adjudication, not to the practice by which the result is reached. Appellant traces the statutory history of the Milwaukee county court and concludes that it is more restricted in this respect than other county courts and must conform to circuit court procedure. We can only say that we do not believe so. Accordingly, we hold that the learned trial judge did not err in entertaining the proceeding, presented to his court by petition and order to show cause. We turn, then, to the real problem.

An estate held by two persons in joint tenancy is one which the cotenants enjoy equally during their lives and which goes wholly to the survivor as an estate of inheritance upon the death of either of them. The question now before us is whether this right of survivorship is affected when one tenant murders the other. In some jurisdictions it is held

that the circumstances of the death are immaterial and the right of survivorship takes its customary course. *Welsh v. James* (1951), 408 Ill. 18, 95 N. E. (2d) 872. Other states refuse to permit the wrongdoer to profit from his crime and withhold from him that which he would have taken if the death had not been due to his illegal act. *Perry v. Strawbridge* (1908), 209 Mo. 621, 108 S. W. 641. Wisconsin is committed to the latter view. In *Estate of Wilkins* (1927), 192 Wis. 111, 211 N. W. 652, we considered the case of one "K." who was the legatee of Wilkins and who, not knowing of the legacy, murdered Wilkins and immediately committed suicide. The county court determined that, because of his deed, the murderer took nothing under the will. Mr. Justice DOERFLER, speaking for this court said (p. 119) :

". . . by his [the judge's] decree he in effect held that the will became inoperative at the time of the death of the testatrix, in so far as the rights of K. were concerned, and with this holding we fully agree.

"The equitable doctrine that a man shall not profit by his own wrong dates back centuries in the history of the common law, and is as old as equity itself. It is recognized, as far as we are able to determine, in the laws of all civilized communities. It lies at the foundation of every religious faith, and may be said to be one of the cornerstones of the Christian religion. It is vitally essential to the administration of justice, and a careful search of our statutes fails to reveal that it was ever modified or abrogated. It therefore exists at the present day in Wisconsin, with all the force which it possessed throughout the ages, and this court in holding as it does in this opinion does not intrench upon the legislative field, but, on the contrary, its holding is in harmony with the spirit and intent of the legislature. No system of laws permits a criminal to profit by his own crime, for if this were so, the very object of all law would be subverted."

The appellant administrator stands in the shoes of Henry King. He may have only what King would have if King were living. If King still lived and claimed what his admin-

istrator now claims, his whole claim would be predicated upon his unlawful act. It is, of course, unknown who would have survived except for the murder. The one thing certain is that King was the survivor because he murdered his wife and all his claims as such survivor grow out of the murder. Under the principles quoted from *Estate of Wilkins, supra,* such claims may not be allowed.

Many text writers and a few courts say that legal title shall pass to the slayer but equity will declare him to be a constructive trustee who holds the estate (except for his right to enjoy a one-half interest during his lifetime), for the benefit of his victim's heirs, to whom the entire estate will pass upon such trustee's death. Ames, Lectures on Legal History, pp. 310–322; 3 Scott, Trusts, pp. 2380–2404, secs. 492–494; *Ellerson v. Westcott* (1896), 148 N. Y. 149, 42 N. E. 540; Restatement, °Restitution, pp. 763–775, secs. 187, 188. ·We are committed by *Estate of Wilkins, supra,* page 118, to the view that no estate, in trust or otherwise, passes to the slayer upon the death of the slain. Appellant submits that this is an interference by the court with statutes of descent and that it works attainder and corruption of blood, in violation of our state and federal constitution. No statutes of descent are involved. The devolution of the property is an incident of joint tenancy. The property does not pass to the survivor by inheritance nor according to any laws of descent. Such statutes as there are argue strongly against the possibility of a cotenant husband terminating the joint tenancy by murder. The learned trial court analyzed secs. 246.01, 246.03, and 235.01 (2), Stats., thus:

"The first statute quoted provides that the real estate in question shall not be subject to disposal by Henry King. The second statute quoted provides that the real estate and personal property in question shall not be subject to disposal by Henry King, and the third statute quoted provides that the real estate in question may not be alienated by Henry

King, by deed or otherwise, without the consent of his wife, Viola King.

"It is the decision of this court that by force of the above statutes Henry King was powerless to deprive his cotenant of her interests in the property in question and that since he could not deprive her thereof they must be held and considered to survive her death and upon the death of Henry King the joint tenancy terminated and the estate of the victim became the sole owner of such property."

As to attainder, there is none because in our view of the law the estate never vested in Mr. King. It was this very objection which the decision in *Estate of Wilkins, supra,* at page 118, recognized and dealt with. As there, the will became inoperative as far as K. was concerned at the very moment of death, so here, the joint tenancy became inoperative likewise at such moment in so far as King was concerned. The court is not taking away from the slayer an estate which he has already acquired but "is simply preventing him from acquiring property in an unauthorized and unlawful way, *i. e.,* by murder. It takes nothing from him, but simply says, 'you cannot acquire property in this way.' " *Perry v. Strawbridge, supra* (108 S. W. 641, 648). As to corruption of blood, neither the *Wilkins* decision nor this one prevents heirs of the slayer from inheriting from him property which he already owns. His crime simply prevents him from ever owning this particular estate of inheritance. By statute, about one half of the states have prevented the acquisition of property by an unlawful killing. If such prevention is not unconstitutional when done by statute it is not unconstitutional when done by the court's application of the equitable principles of the *Wilkins Case.* The constitutionality of such legislation, so far as we have found, was attacked only in *Hamblin v. Marchant* (1918), 103 Kan. 508, 175 Pac. 678, id. (1919), 104 Kan. 689, 180 Pac. 811, and was there upheld. An informative discussion of the subject by Mr. John W. Wade is found in 49 Harvard Law

Review, 715. We find no merit in the contention that it is unconstitutional to prevent the acquisition by a murderer of property which he claims to have acquired as a result of his crime.

We conclude that immediately before the murder Mr. King's joint estate in the real and personal property gave him the right to enjoy it equally with his wife during his lifetime. That enjoyment must be preserved but it cannot be enlarged by his unlawful act. Consequently, consistent with our decision in the *Wilkins Case, supra,* his right to have an estate of inheritance upon the death of his cotenant became inoperative at the moment of the death which he caused and prevented the taking by King·and the vesting in him of the enlarged estate. He retained what he had before but gained nothing in addition. That which he already had,—enjoyment of the property equally with his wife during her lifetime,—ended when he died. Mrs. King's rights could not be taken from her by unlawful means. One of such rights was her right to take all the property as surviving joint tenant except as her prior death without her husband's intervention might prevent. No such death ·occurred or can occur. The right which each joint tenant has to acquire the whole estate by outliving his cotenant is subject to the qualification that the joint tenancy has not been terminated during the lifetime of the parties. Such previous severance of the tenancy may be accomplished in various ways. The parties may end it by mutual agreement; either party may convey his interest, whereupon his grantee becomes a tenant in common with the nonconveying tenant; or the joint tenancy may be severed by court action, as by a partition sale or a sale upon execution of a. judgment. We decline to add murder of a cotenant to the approved methods by which one joint tenant may convert the joint tenancy of the other into some different interest, thereby, himself, acquiring an estate which he did not have before his crime.

Since Mr. King could not deprive Mrs. King of her right to hold as joint tenant by his illegal act, the right must be considered to remain in existence and to become operative when Mr. King died. Though Mrs. King died, under these circumstances her status as joint tenant continued in her administrator and heirs at law; and when her husband died and his life interest in the property ended, her joint tenancy became her estate of inheritance in the entire property. King had nothing for his administrator and heirs at law to take. Mrs. King's administrator takes her personal property and her heirs at law her realty, as the learned trial court determined.

*By the Court.*—Judgment affirmed.

CURRIE, J. (*dissenting*). The members of the court who join in this dissenting opinion fully agree that the equitable doctrine, that a man shall not profit by his own wrongdoing, should be invoked in this case. However, this case is one of first impression in this state and we believe that this court should by its decision herein attempt to establish that principle as a precedent which will be most equitable.

3 Bogert, Trusts and Trustees (Part 1), p. 48, sec. 478, states that the courts have reached three results in a case where one joint tenant murders the other. Some courts, applying what the author terms "mediaeval logic with regard to joint tenancy and entireties" have held that the murderer takes the property freed from the rights of survivorship of the murdered joint tenant. Other courts, by invoking the fiction of constructive trusts, have arrived at the same result as that stated in the majority opinion herein. Then, as the author points out, "Some courts have, however, divided the fee, and permitted the wrongdoing spouse to retain half, as if a divorce had occurred."

We believe that the last-mentioned result is the most equitable and can be justified upon the theory that the murder

operates as a severance of the joint tenancy resulting in a tenancy in common whereby the murderer retains ownership to an undivided one-half interest, but gains no title in, or enjoyment of, the other half, which other half vests in the heirs at law and next of kin of the murdered joint tenant.

In *Bassler v. Rewodlinski* (1906), 130 Wis. 26, 28, 109 N. W. 1032, 7 L. R. A. (N. S.) 701, it was said:

"The special significant incident of joint tenancy is the right of survivorship, by which on the death of any tenant his interest goes to his survivors. Anything which destroys the unity of title or interest without affecting the unity of possession will turn the interest severed from the others into a tenancy in common as regards the remaining joint tenants. 2 Bl. Comm. 192; 1 Washb. Real Prop. (6th ed.) sec. 864. The most familiar method of so severing the interest of one joint tenant from the interests of others is by alienation."

In the instant case, except as to the homestead, the husband any time during the lifetime of himself and his wife could have obtained a severance of the joint tenancy by alienation. As to all the joint property, including the homestead, he could have obtained such severance by partition suit. Likewise such severance could have been accomplished by the aid of a judgment making a property division in a divorce action.

The theory underlying those decisions which justify the result of the heirs of the murdered joint tenant taking all (not merely one half) of the joint property is that, by reason of the murder, the murdered joint tenant is thereby prevented from ever securing title to the whole by survivorship. However, it is entirely a matter of speculation as to which joint tenant would have outlived the other, in the event the murder had not been committed, or that a severance would not have taken place during the lifetime of both joint tenants as a result of alienation by either, partition, or divorce. Therefore, it seems that the result reached in the majority

opinion comes very close to working a corruption of blood, or a forfeiture of estate, as to one who has been guilty of crime, which is prohibited by sec. 12, art. I of the Wisconsin constitution.

I am authorized to state that Mr. Chief Justice FRITZ and Mr. Justice BROADFOOT join in this dissent.